# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: | |
| BDC CAPITAL, INC., | Case No. 11-15340-RGM |
| | (Chapter 11) |
| Debtor. | |

## MEMORANDUM OPINION

THIS CASE is before the court on the debtor's Objection to Proof of Claim No. 8 filed by Branch Banking & Trust Co. (Docket Entry 360) and the Response of HM Investments, LLC (Docket Entry 375). BB&T transferred its claim to HMI on August 29, 2012 (Docket Entry 154).[1]

BB&T loaned the debtor $5,750,000 on May 2, 2008. The note was originally due in one year, however, the note anticipated extensions which were granted until January 14, 2011. The May 2, 2008 promissory note contained a confession of judgment provision which BB&T exercised on July 1, 2011. BB&T confessed judgment against the debtor

> in the sum of $5,218,871.97 WITH INTEREST THEREON AT 5% PER ANNUM FROM July 01, 2011, UNTIL PAID, and the costs of this proceeding,  , *[sic]* INCLUDING ATTORNEY'S FEE OF  , *[sic]* AND COLLECTION FEES PROVIDED FOR IN THE INSTRUMENT ON WHICH THIS PROCEEDING IS BASED.

Order Confessing Judgment, Proof of Claim 8-1 at 5 (capitalization in original). The Order Confessing Judgment is consistent with the Confession of Judgment signed by William Ziegler, the attorney-in-fact authorized in the promissory note to confess the judgment. Confession of Judgment, Proof of Claim 8-1 at 4.

---

[1] BB&T asserted four claims against the debtor in Proof of Claim 8. Only the fourth claim was sold to HMI and is involved in this objection.

BB&T asserted a claim as of the petition date of $5,233,170.17. It also claimed post-petition charges of $102,232.70 through November 21, 2011.[2] In the hopes of paying HMI in full and dismissing its case, the debtor asked HMI for a payoff statement. HMI demanded $6,658,387.58 as of October 23, 2013 plus per diem interest of $1,185.8251. It also claims additional attorney's fee of about $300,000. The debtor objected to the Proof of Claim, asserting that the interest rate was fixed at 5.0%, not the default rate of 8.25%, and that attorney's fees after July 1, 2011 are not recoverable. HMI asserts that it is oversecured, a proposition that the debtor does not contest. 11 U.S.C. §506(b).

If this were a case of a simple note reduced to judgment, the resolution of the claim would be relatively simple and straightforward. HMI, as an oversecured creditor, would be entitled to the amount of its judgment and interest as provided in the judgment until the judgment is paid in full. *Sands v. Roller,* 118 Va. 191, 86 S.E. 857 (1915). The note is merged into the judgment.[3]

---

[2]The Proof of Claim states:

**JUDGMENT DATED 7/1/2011 (See Exhibit 4)**
**(Promissory Noted dated 5/2/08 - Loan Account ******9727 00 00004**
**Amounts as of Petition Date**

| | |
|---|---|
| Principal | $5,174,509.68 |
| Pre-Judgment Interest (@8.25%)) | $44,362.29 |
| Pre-Petition, Post-Judgment Interest | $14,298.20 |
| **Total** | **$5,233,170.17** |
| | |
| **Accrued Charges Post Petition** | |
| Interest from 7/21/11 through 11/21/11 | $102,232.70 |
| **Total** | **4102,232.70** |
| | |
| Interest | 5.00% |
| Per Diem | $714.91 |
| **TOTAL** | **$5,335,402.87** |

[3]HMI argues that it is not this simple. It argues that a judgment debtor has 21 days after notification of a confessed judgment to file a motion to set the judgment aside. Va.Code (1950) §8.01-432. The debtor filed bankruptcy on the twenty-first day. Thus, HMI argues, the judgment can still be modified as to the post-petition judgment interest rate and the attorney's fees. Section 8.01-432 only speaks to the judgment debtor's ability to set the confessed judgment

2

This transaction is more complicated. The debtor was also a lender. It regularly loaned money in real estate transactions and was secured by the real estate involved. In order to fund its loans, it borrowed from banks. In this instance, the debtor loaned $5,750,000 to Hunter Mill East and borrowed the same amount from BB&T to make that loan. BB&T took a security interest in the Hunter Mill East note and loan documents, including the assignment of the deed of trust securing

---

aside, not the judgment creditor's right to do so. It provides that the confessed judgment may be set aside "on any ground which would have been an adequate defense or setoff in an action at law instituted upon the judgment creditor's note, bond or other evidence of debt upon which such judgment was confessed." This provision simply allows a defendant to have his day in court if he has a defense. Mr. Beard, the debtor's principal, testified that the debtor was in default of the note when the judgment was confessed and that the debtor has no defense to the judgment entered. HMI's argument is more properly founded on Rule 1:1 of the Rules of the Virginia Supreme Court which provides that "[a]ll final judgments, orders, and decrees . . . shall remain under the control of the trial court and subject to be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer." This rule is jurisdictional. After 21 days, the trial court has no jurisdiction to modify a final order. The trial court has the jurisdiction to modify interlocutory orders.

The confessed judgment is a final order. It disposed of the entire case and left nothing to be done. BB&T, the judgment creditor at the time, had the right to execute on the judgment when entered and the judgment created a lien on real property when docketed. Va.Code (1950) §8.01-436 ("[T]he lien thereof shall attach and be binding from the time such judgment is recorded on the judgment lien docket of the clerk's office of the county or city in which land of the defendant lies.") Indeed, BB&T sought to domesticate the judgment in South Carolina within the 21-day period. The Notice of filing Foreign Money Judgment was dated July 13, 2011, and filed July 27, 2011. The Notice correctly states that "The Judgment is a final judgment and it remains unsatisfied." Ex. G at ¶3.

While the judgment may be subject to revision, it has not been revised. This court gives the state court judgment its full effect, which includes the amount – or in this case, the absence – of attorney's fees awarded. This court should not speculate as to what the state court would do if HMI sought to modify the final judgment by asserting that its predecessor in interest made a mistake in the applicable interest rate and in the amount of attorney's fees actually incurred after the judgment was entered. It is by no means certain that the state court would modify the order. There are indications that BB&T made a knowing choice of the 5% post-judgment interest rate. The Proof of Claim shows the pre-judgment interest rate at 8.25%, the default rate. The principal amount of the debt plus the pre-judgement interest rate at 8.25% totals $5,218,871.97, the exact amount of the confessed judgment. The evidence before this court shows two potential post-judgment interest rates and a choice made by BB&T to select the 5.0% rate. The evidence is ambiguous as to a mistake. Mr. Beard also testified that he received no notice of certain matters. While the absence of notice is not a defense to a judgment on the note, it might be a defense to the default interest rate. On this record, this court should not modify the state court judgment as requested by HMI. This court gives effect to a state court judgment as it finds it.

HMI is likely not surprised by this result. While the August 15, 2012, time entry for Valerie P. Morrison is not entirely clear, it suggests that HMI considered this issue about the time it was purchasing the note. The time entry states, "Review loan documents and confessed judgment regarding default interest rates and attorneys fees to follow up on client inquiry." Ex. 27.

3

the Hunter Mill East note which was contemporaneous with BB&T making its loan to the debtor. Ex. 8.  It is the Hunter Mill East note and loan documents that were BB&T's collateral for the debtor's loan and which now secure HMI, the present holder of the BB&T note.

*Sands* is founded on the doctrine of *res judicata.* A party may not file sequential suits on the same cause of action.  A judgment merges the underlying contract into the judgment and extinguishes it.  The Virginia Supreme Court stated:

> That cause of action can never again become the basis of a suit between the same parties.  It has lost its vitality; it has expended its force and effect.  All its power to sustain rights and enforce liabilities has terminated in the judgment.  It is drowned in the judgment, and must henceforth be regarded as functus officio.

*Id. See also Safrin v. Travaini Pumps USA, Inc.,* 269 Va. 412, 611 S.E.2d 352 (2005) (attorney's fees incurred to collect judgment and not contained in confession of judgment order not recoverable).

However, the benefits of *res judicata* can be waived.[4]  *Gary Steel Products Corp v. Kitchin,* 197 Va. 471, 90 S.E.2d 120 (1955) (finding that the two suits were founded on two separate causes of action).  *Republic Ins. Co. v. Culbertson,* 717 F.Supp. 415, 419 (E.D.Va. 1989) applied the waiver principle.  It found that the defendant had waived this right.  Republic had issued a bond which it had been called upon to honor.  Culbertson had entered into an indemnity agreement agreeing to indemnify Republic against any loss on the bond.  When sued on the bond, Republic filed a cross-complaint and a third-party complaint against Culbertson on the indemnity agreement and obtained

---

[4]"This rule prohibiting the splitting of causes of action is a rule of justice based on principles of public policy. It exists for the benefit and protection of the defendant, is intended to prevent vexatious litigation, and to avoid the costs and expenses incident to numerous suits on the same cause of action.  Hence, it is not altogether a rule of legal right but rather an equitable interposition of the courts to prevent a multiplicity of actions.  Consequently, the defendant may waive or renounce the benefits of the rule by either expressly or impliedly consenting to separate suits on a single cause of action.  Furthermore, such a waiver will be presumed unless timely and proper objection is made.  *Fentress v. Pruden,* 185 Va. 461, 39 S.E.(2d) 240; *Shepherd v. Engineering Co.,* 184 Va. 802, 36 S.E.(2d) 531; *Jones v. Morris Plan Bank,* 168 Va. 284, 191 S.E. 608." *Gary Steel Products Corp.,* 197 Va. at 474-475, 90 S.E.2d at 122-123.

a judgment.  Later, it filed a second suit against Culbertson on the same indemnity agreement seeking to recover attorney's fees it had expended on the appeal of the first case.  While the District Court recognized that the second suit would ordinarily be barred by *Sands* and also by *Caudill v. Wise Rambler, Inc.,* 210 Va. 11, 168 S.E.2d 257 (1969) and *Joyce v. A.C. & S., Inc.,* 785 F.2d 1200 (4th ir. 1986), it distinguished the case before it because Culbertson had expressly agreed in the indemnity agreement that "separate suits may be brought [under the indemnity agreement] as causes of action accrue." *Republic Ins. Co.* at 419-421 ("The court holds that the Indemnity Agreement includes a waiver of the *res judicata* and merger defenses.").

This case is distinguishable from *Republic Ins. Co.*  Here, the promissory note does not contain any provision that authorizes multiple suits.  Thus, the Confession of Judgment Order resolves all matters arising under the promissory note, both the amount due as of July 1, 2011 and the interest rate on the judgment.  No attorney's fees were awarded in the Confession of Judgment Order. They cannot be awarded now. *Safrin v. Travaini Pumps USA, Inc.,* 269 Va. 412, 611 S.E.2d 352 (2005). There is no waiver in the promissory note authorizing a later suit. *Republic Ins. Co.*

That is not the end of the case.  The promissory note does not contain all of HMI's rights. It holds the Hunter Mill East note and loan documents as collateral.  The Confession of Judgment Order did not merge those rights and obligations into the judgment.  They are separate and distinct undertakings.  They are independent of the judgment and remain fully viable.  The documents themselves confirm that they are independent obligations.  Under the Assignment of Promissory Note as Collateral, the debtor assigned its interest in the renewal note made by Hunter Mill East to the debtor.  Ex. 11.  Upon the debtor's default, BB&T – and later HMI – had the right to "exercise all of the rights of an unconditional owner or holder" of Hunter Mill East's note to the debtor.  Ex.

5

11, Assignment of Promissory Note as Collateral at ¶5. The provision continues:

> Assignor hereby constitutes, appoints and makes the Bank its true and lawful attorney-in-fact to exercise such rights in Assignor's or Bank's name or otherwise, in Assignor's place and stead with full power of substitution, **at Assignor's expense** and without notice, including but not limited to the following with respect to the [Hunter Mill East] Note . . . [t]he commencement of any proceeding, suit or action under any provisions of the Bankruptcy Act, as amended

*Id.* at ¶5 (emphasis added). The debtor was the Assignor.[5]

Similarly, in the Assignment of the Deed of Trust Note as Collateral, the debtor agreed to reimburse and pay BB&T – and now HMI – "all reasonable out-of-pocket costs and expenses . . . including, without limitation, reasonable attorneys' fees and expenses, advanced, incurred by, or on behalf of the Bank in collecting and enforcing this Assignment, the Obligations, the Note, or the Security Instruments." Ex. 7, Assignment of the Deed of Trust Note as Collateral at ¶9 (all referring to the Hunter Mill East note and security documents). The Assignment also provided that the remedies were cumulative. *Id.* at ¶11 ("[T]he exercise or beginning of the exercise by the Bank of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by the Bank of any or all such other rights, powers, or remedies.").

The court concludes that while HMI's right to post-judgment attorney's fees is precluded by the confessed judgment, HMI has separate and independent rights to protect its collateral, that is, the Hunter Mill East note. For example, if the collateral had been a grocery store, there would be little doubt that expenditure of funds to keep the electricity on to run the refrigerators until the collateral – perhaps fresh fruits and vegetables, or frozen foods – could be disposed of would be an appropriate expenditure. Securing the premises would be an appropriate expenditure. Here, the fees are for

---

[5]Neither the debtor nor Hunter Mill East had filed bankruptcy on July 1, 2011, when BB&T confessed judgment against the debtor. The debtor filed on July 21, 2011, and Hunter Mill East filed on November 9, 2012.

attorneys whose services were necessary to protect the collateral.  The fact that the fees are for attorney's services rather than electrical service or for security officers makes no difference.  If the attorney's services were necessary to protect the collateral, they stand on the same footing as electrical or security services.

Hunter Mill East defaulted on its obligations to the debtor which in turn caused the debtor to default on its obligations to BB&T.  In order to protect itself, the debtor filed its chapter 11 petition on July 21, 2011.  The debtor's usual practice when one of its borrowers defaulted was to foreclose on the real estate that was collateral for the loan and then, if it was the successful purchaser at the foreclosure sale, sell the property.  With Hunter Mill East's default and the debtor's bankruptcy, BB&T and the debtor were unable to agree who would conduct the foreclosure.  BB&T's interest was to be continuously secured despite a foreclosure and the debtor felt that it was is a better position to sell the property after a foreclosure.  Ultimately, HMI and the debtor agreed that the debtor would foreclose and would provide a new deed of trust on the property if it were the successful bidder.  Upon noticing the foreclosure, Hunter Mill East filed its own chapter 11 petition.

To complicate matters, Hunter Mill East owns one of several parcels that, in the aggregate, contain about 75 acres of undeveloped land.  The other parcels are owned by John Thoburn or entities he controls.  The assemblage is located near a Metro station on the new Silver Line that will link Dulles International Airport with Washington, D.C.  Although behind schedule, the first half of the Silver Line is scheduled to open within several months.  The assemblage is one of the last major unimproved tracts of land in Fairfax County.  Fairfax County is very interested in developing the assemblage under a single development plan that would include a major road realignment to be substantially paid for by the developer. Various lenders are secured by the different parcels. Overall,

all of the Thoburn entities were in default and are before this court in their own chapter 11 proceedings. The chapter 11 petition of Hunter Mill East completed the filings by the Thoburn entities.

Thoburn's plan was to sell the assemblage to a developer. He marketed the assemblage and contacted all of the major developers. The developer would likely be a national builder or a small consortium of significant builders. While public auctions of chapter 11 debtor's assets are common in a liquidating case, Thoburn anticipated a private sale because of the complexities involved in the development of the property. While he was open to and did discuss sales with those interested, he settled on Pulte Home Corporation as the purchaser. A motion to approve the contract was filed on August 29, 2012. He later filed a joint plan that was confirmed. It incorporated the Pulte contract. The key to the plan – other than the Pulte contract – was a take-out loan that would pay-off several large lenders who did not want to wait for the contract to close. Closing is likely several years down the road after various development objectives are achieved. Unfortunately, the take-out lender did not close and the plan is not performing.

That brief history is not simply an excursus. It is significant because another national builder, Toll Brothers, also wanted to purchase and develop the property. It formed HMI which bought BB&T's note. The Transfer of Claim Other Than for Security (Docket Entry 154), was dated August 29, 2012. HMI also purchased an $8,060.73 claim in the Thoburn Limited Partnership bankruptcy. The Transfer of Claim Other Than for Security (*In re Thoburn Limited Partnership,* Case No.12-11243-RGM, (Bankr.E.D.Va., Docket Entry 140), was dated October 2, 2012. The docket entry immediately following the Transfer of Claim was HMI's objection to the Pulte contract.

HMI's legal fees since it acquired BB&T's note exceed $900,000. HMI first retained H.

8

Jason Gold of Wiley Rein LLP. Mr. Gold's first time entry is August 6, 2012, several weeks before HMI purchased BB&T's note about August 29, 2012. The firm's last time entry for which reimbursement is sought is April 23, 2013. Mr. Gold and Wiley Rein continued to represent HMI until about July 19, 2013 when Lawrence A. Katz of Leach Travell Brice pc entered his appearance.

On November 8, 2013, Thoburn Limited Partnership which was the lead proponent of the chapter 11 plan for the related Thoburn entities filed its Motion to Designate Vote of HM Investments, LLC. (*In re Thoburn Limited Partnership,* Docket Entry 555). It sought to designate the vote of HMI pursuant to §1126(e) of the Bankruptcy Code and to declare HMI's purported §1111(b) election invalid.

HMI is owned, directly or through another entity by Toll Brothers. Mr. Schroeder, the president and counsel of HMI, testified that one of the objectives of Toll Brothers was to acquire the Thoburn assemblage. He testified that he allocated Wiley Rein's invoices between attorney time to protect HMI's collateral and Toll Brothers' efforts to acquire the property. The same four attorneys worked on both aspects of the case. Although Wiley Rein separated its time into two the billings, Mr. Schroeder reviewed all time entries. HMI does not seek any reimbursement for the time Mr. Schroeder identified as applying to Toll Brothers' acquisition efforts. Mr. Schroeder allocated $305,577.95 of attorney time to legal work related to its claim and $377,048.15 allocated to Toll Brothers' acquisition effort. These totals include some of Leach Travell's invoices, but not the most recent billings, which Mr. Katz stated in court may be about another $300,000. Unredacted copies of all statements were provided to the court, including the most recent Leach Travell statements.

HMI was correct in allocating the legal fees between the two aspects of counsel's representation. The loan documents only permit reimbursement of fees and expenses to preserve or

9

protect its collateral. To the extent that attorney's fees were incurred to acquire the assemblage, they are not recoverable.

Mr. Schroeder testified as to his review of the invoices and the allocation of the charges between the two projects. The court recognizes Mr. Schroeder's connections with HMI and Toll Brothers. His testimony was credible and unrebutted. After having reviewed the court dockets and the unredacted legal invoices, the court concludes that Mr. Schroeder's allocation was substantially warranted. Any differences would be judgment calls. Without a credible challenge to Mr. Schroeder's allocations, they will stand.

The remaining legal fees are the various law firms' time and efforts in the several bankruptcy cases: BDC, the debtor; John Beard, the debtor's principal; the various Thoburn entity cases, including Hunter Mill East; and John Thoburn, the principal of the Thoburn entities. HMI's collateral for the debtor's loan – the Hunter Mill East note, deed of trust and loan documents – is intertwined with the fate of the related Thoburn entities. To the extent that the fees are for efforts to collect the judgment BB&T confessed against the debtor, the fees are barred by *Sands*. To the extent that they are to protect HMI's collateral, they are recoverable. The problem is to distinguish between the two. Mr. Schroeder did not allocate any of the time entries remaining after he removed the time entries related to Toll Brothers' acquisition efforts between collection of the judgement and protection of the collateral. He testified that all of the remaining time entries were for the protection of the collateral.[6]

This is an unusual case. Protection of HMI's collateral required involvement in the Thoburn

---

[6] A properly executed and filed proof of claim constitutes prima facie evidence of the validity and amount of the claim. Fed.R.Bankr.Proc. 3001(f). The proof of claim did not contain a copy of the redacted legal invoices, nor does it contain an assertion of the amount due for legal fees.

cases. Preserving the assemblage was central to preserving the value of HMI's collateral.[7] The manner in which the assemblage is developed is the key to the success of this case, payment in full of all creditors and a return to the owners. The difficulty with the remaining time entries is that some actions could have been taken to protect the collateral or to collect the debt or both. For example, a great deal of time was expended by Wiley Rein on its motion for relief from the automatic stay and the motion to dismiss. In a simpler case, a motion for relief from the automatic stay would likely be an effort to collect on the judgment and no further attorney's fees would be allowed, the judgment having already determined the proper amount of attorney's fees for the collection of the note. In this case, there is also an element of protecting HMI's collateral. In the unusual circumstances presented by this case, unless the time entries remaining after allocation to the acquisition of the property are solely for protection of the collateral or for collection of the note – in which case they will be allowed or disallowed, respectively – they will be allowed as a recoverable attorney's fee if there is a reasonable nexus to the protection of the collateral even if there is also a nexus to collection of the debt. Using this standard, Mr. Schroeder's allocation was correct. The amount of recoverable attorney's fees is the total of $305,577.95 and any qualifying attorney's fees for Leach Travell Britt reflected on invoices not included in the trial exhibits and are incurred through the date of the payoff.[8]

---

[7]HMI alleged that it was undersecured in it August 2012 motion for relief from the automatic stay. If it had been, it would not have been entitled to any attorney's fees. 11 U.S.C. §506(b). It is very possible that HMI would be undersecured if the assemblage is broken up. The valuation the parties rely on was made as part of the confirmation process during which the intended use of the property was as a single, unitary development. 11 U.S.C. §506(a) ("Such value shall be determined in light of the purpose of the valuation and of the proposed disposition of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.")

[8]This does not presume that the debtor's pending motion to approve a structured dismissal with a full pay-off of all creditors will be approved. Whether the motion is granted or denied and whether the pay-off is sooner or later, the manner of the calculation remains the same.

In summary, the allowed amount of HMI's proof of claim is $5,233,170.17 as of July 21, 2011, plus post-petition interest at the rate of 5.00% per annum and attorney's fees and costs of $305,577.95 plus additional qualifying attorney's fees until the claim is paid in full. In the event the value of HMI's collateral is not sufficient to pay this amount in full, the claim, if reconsidered, will be the greater of $5,233,170.17 and the value of the collateral.

Counsel for HMI will prepare an appropriate order.

Alexandria, Virginia
May 24, 2014

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Madeline A. Trainor
Lawrence A. Katz

19469